SAMUEL DANCE et al., Appellants, v TOWN OF SOUTHAMP-
TON, Respondent.

Second Department, September 26, 1983

**APPEARANCES OF COUNSEL**

*Kelly & Jiras* and *David Jaroslawicz* (*Robert Kelly* of
counsel), for appellants.

*Mulholland, Minion, Roe & Clifford* (*Michael Majewski*
and *Joseph D. Ahearn* of counsel), for respondent.

**OPINION OF THE COURT**

LAZER, J.

At the completion of a trial on the issue of liability in
this negligence action against the Town of Southampton,
the jury found the town free of fault and judgment was
entered in the town's favor. We conclude that the gravity of
certain trial errors and the interests of justice compel
reversal and a new trial.

I

On October 7, 1979, plaintiff Samuel Dance drove his Ford Pinto southerly on a road that intersected Bridgehampton Turnpike at a narrow angle. Immediately after the Pinto entered the southbound lane of the Bridgehampton Turnpike it was struck from behind by a Town of Southampton police car and the consequence to Dance was quadriplegia. Among the principal issues at the trial were the speed and manner in which the police car had been driven and whether Dance had stopped at a yield sign before entering the southbound lane of Bridgehampton Turnpike, which is a two-lane highway.

Dance testified that he stopped at the yield sign before entering the turnpike and that the police car did not come into his view until he was fully in the southbound lane of traffic. On cross-examination he admitted that prior to the collision several surgical procedures had been performed on his right knee, but he insisted that his ability to drive was unaffected. This contention was supported by Dance's orthopedist who testified that his patient's ability to drive was unimpaired by the knee injury. The town's orthopedist was of a contrary view, declaring that the range of motion of Dance's knee would have been substantially restricted, that leg movements between pedals would have caused pain, and that the ability to apply braking force would have been sharply diminished. The fact that Dance had not reported his condition to the Commissioner of Motor Vehicles became a major focus of the town's defense.

Dance's case was buttressed by the testimony of Roy Surprise who claimed to have been driving south on Bridgehampton Turnpike just prior to the accident when he saw a southbound police car pass a station wagon in a nonpassing zone. Upon the approach of a northbound vehicle, the police car — proceeding at about 65 miles per hour — made a hasty return to the southbound lane which Dance had just entered and the collision ensued. Surprise stopped at the accident scene but did not report his story until about a year after the occurrence. The driver of the station wagon testified that the police car passed her at least a half mile before the scene of the accident. Another witness, whose home was adjacent to the turnpike, testi-

fied that he saw Dance stop at the yield sign "for maybe a second or two" before entering the turnpike.

The driver of the police car, Officer William Beyer, presented yet another version of the incident when he told the court that Dance had entered the highway without stopping at the yield sign and then decreased the speed of his car until it almost came to a halt. Beyer claimed that his own speed was only 50 miles per hour, and that he had slammed on his brakes as soon as he saw Dance's car but was unable to avoid the collision.

The accident reconstruction experts were in partial conflict. Plaintiffs' engineer concluded that the police car had been traveling at 62 miles per hour before it started braking and that its speed at impact was 35 miles per hour, while Dance's was about 25 miles per hour. Defendant's expert agreed with the conclusion as to the impact speeds, but contended that the police car's speed before braking was between 49 and 55.4 miles per hour. It was his belief that Dance had not stopped at the yield sign because a Pinto could not have reached the point of impact at a speed of 25 miles per hour if it had stopped. The other evidence in the case was subject to conflicting inferences.

The jury determined that the town had not been negligent.

## II

On appeal, plaintiffs argue that the trial court committed reversible error when, in dealing with Dance's failure to report his knee condition to the Commissioner of Motor Vehicles, it charged the jury that a violation of subdivision 4 of section 506 of the Vehicle and Traffic Law was negligence per se for which Dance was to be held liable if the violation was the proximate cause of the accident. Subdivision 4 — which was read to the jury — provides that: "Any person holding a license issued pursuant to this chapter who suffers permanent loss of use of one or both hands or arms or of one or both feet or legs, or one eye shall, before operating any motor vehicle or motorcycle make report thereof to the commissioner, who shall take such reasonable action as may be proper under the provisions of this section."

The court also charged that a violation of subdivision 9 of section 509 of the Vehicle and Traffic Law would constitute negligence. That subdivision provides that "[w]henever notice of disability is required to be given to the commissioner as required by this article, no person shall operate any motor vehicle unless such notice has been given." During its deliberations, the jury requested that both sections of the Vehicle and Traffic Law be repeated. Having failed to except to these charges at the trial, plaintiffs now assert that subdivision 4 of section 506 applies solely to the total loss of use of a limb and not a partial loss as was the case with Dance's leg. Whether a partial loss must be reported to the commissioner if it substantially affects a person's ability to drive (see, also, Vehicle and Traffic Law, § 404-a, subd 3) is an issue we need not reach, for we conclude that the sections charged do not create a statutory duty of care for the benefit of individual motorists. Therefore, it was error for the trial court to invoke the doctrine of negligence per se in connection with either section.

Under common law, a person is negligent when he fails to exercise that degree of care which a reasonably prudent person would have exercised under the same circumstances. When a statute designed to protect a particular class of persons against a particular type of harm is invoked by a member of the protected class, a court may, in furtherance of the statutory purpose, interpret the statute as creating an additional standard of care (see *Trimarco v Klein,* 56 NY2d 98, 108; *Martin v Herzog,* 228 NY 164, 168; Restatement, Torts 2d, § 286; 1 NY PJI2d, pp 152-153). Violation of such a statutory standard, if unexcused, constitutes negligence per se so that the violating party must be found negligent if the violation is proved (see, generally, 2 Harper and James, Law of Torts, § 17.6; Thayer, Public Wrong and Private Action, 27 Harv L Rev 317; Lowndes, Civil Liability Created by Criminal Legislation, 16 Minn L Rev 361; Morris, The Role of Criminal Statutes in Negligence Actions, 49 Col L Rev 21; James, Statutory Standards and Negligence in Accident Cases, 11 La L Rev 95). Negligence per se is not liability per se, however, because the protected class member still must establish that the statutory violation was the proximate cause of the occur-

rence (see *Martin v Herzog, supra;* Prosser, Contributory Negligence as Defense to Violation of Statute, 32 Minn L Rev 105, 111).

Whether a statutory requirement creates a standard of care is frequently a matter of judicial construction (see Morris, The Relation of Criminal Statutes to Tort Liability, 46 Harv L Rev 453). Where a regulatory statute contains no reference to a civil remedy for its violation, the method most frequently used by the judiciary to justify recognition of a standard of care is to discern an implied or presumed legislative intent to create such a standard. A more satisfactory explanation for judicial recognition of such a standard, however, is furtherance of the statute's underlying policy for the protection of certain individuals (see Prosser, Torts [4th ed], p 191; 2 Harper and James, Law of Torts, § 17.6, pp 994-995). Where the statute codifies an already existing common-law rule or where the conduct prohibited is closely related to common-law negligence, a violation of the statute is often regarded as negligence per se (Prosser, Contributory Negligence as Defense to Violation of Statute, 32 Minn L Rev 105, 109-110). But where the statutory requirement constitutes a departure from common-law standards, the doctrine of negligence per se should be applied flexibly rather than rigidly, for rigid application may impose liability upon violators who are free from fault in any real sense and the result may be substantial civil damages totally disproportionate to the relatively small penalty prescribed by statute (James, Statutory Standards and Negligence in Accident Cases, 11 La L Rev 95, 108; Morris, The Relation of Criminal Statutes to Tort Liability, 46 Harv L Rev 453, 458). Thus, the terms of a regulatory statute should not receive automatic construction as a standard of care in negligence litigation, for judgment should be exercised as to the appropriateness of the statute for that purpose (James, Statutory Standards and Negligence in Accident Cases, *op. cit.,* p 119).

A prime illustration of flexibility of application is to be found in the judicial attitude toward vehicular licensing statutes. Almost universally, licensing statutes are not regarded as creating a duty to individual highway travelers or pedestrians (see Prosser, Torts [4th ed], p 193;

Gregory, Breach of Criminal Licensing Statutes in Civil Litigation, 36 Cornell L Q 622; Note, The Effect of Penal Statutes on Civil Liability, 32 Col L Rev 712, 719; Note, Negligence — Violation of Statute or Ordinance as Negligence or Evidence of Negligence — Rules in Minnesota, 19 Minn L Rev 666, 672; 5A Warren, Negligence in the New York Courts, Automobiles, § 1.05; 7A Am Jur 2d, Automobiles and Highway Traffic, §§ 427-430; Ann., 29 ALR2d 963). New York's view comports with the general one, for it rejects violation of motor vehicle licensing statutes as negligence (see *Hanley v Albano,* 20 AD2d 644; *Phass v MacClenathen,* 274 App Div 535; *Clarke v Doolittle,* 205 App Div 697; *Messersmith v American Fid. Co.,* 187 App Div 35, affd 232 NY 161; *Hyde v McCreery,* 145 App Div 729).

The most persuasive of the various explanations for the rejectionist attitude is the fact that licensing statutes do not establish standards of care under which drivers must perform certain acts in relation to other drivers in any prescribed fashion (Gregory, Breach of Criminal Licensing Statutes in Civil Litigation, 36 Cornell L Q 622, 632; Morris, The Relation of Criminal Statutes to Tort Liability, 46 Harv L Rev 453, 458). In contrast to sections of the Vehicle and Traffic Law that are clearly intended to set statutory standards of conduct (see, e.g., tit VII [rules of the road]; art 9 [equipment]), licensing statutes do not specify the standard or correct method of using or equipping a motor vehicle. The rejection of licensing statutes as standards of care emanates from reasoned policy judgments which recognize that while unlicensed drivers may be incompetent in particular cases, the possibility of exceptions is significant enough to justify a case-by-case determination of negligence without the automatic imposition of negligence under the negligence per se doctrine (Komesar, In Search of a General Approach to Legal Analysis: A Comparative Institutional Alternative, 79 Mich L Rev 1350, 1380). In addition, it is often stated that a violation, such as driving without a license, is not the proximate cause of the injury (see, e.g., *Hanley v Albano,* 20 AD2d 644, *supra; Hyde v McCreery,* 145 App Div 729, *supra*). While this latter approach has been criticized as mislead-

ing since causation is normally for the trier of fact and consideration of the causation issue begs the question as to whether a duty exists (see James, Statutory Standards and Negligence in Accident Cases, 11 La L Rev 95, 121), we conclude that causation is subsumed under statutory purpose analysis. The strength of the logical connection between violation of the statute and injury is an appropriate concern in deciding whether the statutory purpose will be furthered by invocation of the doctrine of negligence per se (see Gregory, Breach of Criminal Licensing Statutes in Civil Litigation, 36 Cornell L Q 622, 635).

We turn, then, to the basis for our conclusion that the trial court erred in invoking the doctrine of negligence per se with respect to Dance's asserted violation of the disability reporting sections of the Vehicle and Traffic Law. The reporting requirements, originally enacted as an amendment to section 20 of the Vehicle and Traffic Law of 1929 (see L 1948, ch 257), were more recently recodified in a new article 19 of the Vehicle and Traffic Law entitled "Licensing of Drivers" (L 1972, ch 780; Memorandum of State Department of Motor Vehicles, NY Legis Ann, 1972, pp 282-284). Since civil liability goes unmentioned in these sections or their legislative history, and since the statutes involve an area not directly covered by common-law standards, justification for adoption of their requirements as standards of care depends on considerations of sound policy (see Morris, The Role of Criminal Statutes in Negligence Actions, 49 Col L Rev 21, 22).

The reporting statutes are constituents of the State's licensing scheme and we believe that they create no standard of care bearing on negligence. Under the reporting statutes, the licensee is required to give notice of disability to the Commissioner of Motor Vehicles and may not operate any vehicle until such notice has been given (Vehicle and Traffic Law, § 509, subd 9). However, in the absence of any determination by the commissioner relating to the licensee's competency to drive, violation of the reporting requirement is an omission that falls in the same class as failure to obtain a license before driving. Neither the reporting statute nor the statute that requires a driver to obtain a license before driving specifies the correct method

of operating or equipping the vehicle, so that there is in fact no standard of care to adopt for negligence actions (Gregory, Breach of Criminal Licensing Statutes in Civil Litigation, 36 Cornell L Q 622). The usual reasoned policy considerations support our conclusion. While under some circumstances a person who breaches the reporting mandate may be wholly or partially incompetent to drive, we cannot ignore the strong possibility that such a violator actually may exercise due care and drive properly in a particular situation (Komesar, In Search of a General Approach to Legal Analysis: A Comparative Institutional Alternative, 79 Mich L Rev 1350, 1380). Should the reporting requirements become standards of care in negligence actions, juries would be required to find violators negligent without considering any particular violator's actual operation of the vehicle or his or her physical ability to drive when the accident occurred. While the reporting statutes permit licensing authorities to identify incompetent drivers without waiting for the normal license renewal date and thus ultimately reduce highway accidents (see Governor's bill jacket, L 1948, ch 257), to automatically derive a conclusion of negligence from violation of such statutes would present considerable potential for unfairness and overpunishment.

It is true, of course, that the violation of a restriction placed on a license after an examination and administrative determination may be admissible on the question of negligence (see *Martin v Alabama 84 Truck Rental,* 38 AD2d 577), but Dance was not examined by the commissioner and no determination was ever made that he was incompetent to drive or that he needed special devices to do so. Manifestly, it was error for the trial court to charge that violation of the reporting sections was negligence per se.

Since we have reached and decided the merits of the charge issue despite plaintiffs' failure to preserve it for appeal, it is incumbent that we explain why we have done so. We view the interests of justice as requiring that we reach the issue because the case was a close one (see *Carroll v Harris,* 23 AD2d 582), the negligence per se instructions were prejudicial (see *Hartley v Szadkowski,* 32 AD2d 550) and the circumstances of the trial, including

other preserved error, made it quite likely that the erroneous charge affected the jury's determination. The jury found the town entirely free of negligence even though Dance's car was fully in the southbound lane when it was struck from behind with severe impact. The complete exoneration of the town is a significant indication that the erroneous charge influenced the verdict, particularly since the erroneous charge was given twice and since the alleged violation of the reporting statute was referred to in summation as well. The error mandates reversal and a new trial (*DiGrazia v Castronova,* 48 AD2d 249, 251; *Zeleznik v Jewish Chronic Disease Hosp.,* 47 AD2d 199, 207; Memoranda of Judicial Conference, NY Legis Ann, 1973, pp 21-22).

## III

The preserved error to which we have referred was the improper cross-examination of Roy Surprise. During his cross-examination — and in the face of timely objections — Surprise was subjected to repeated questioning concerning arrest warrants and criminal charges, even though it was not shown that he ever had been convicted of a crime and there was no determination of any underlying immoral conduct. The trial record is illustrative:

Q You are not a stranger to a courtroom, are you, sir? You have been in a courtroom on more than several occasions, right?

A To pay traffic tickets.

Q You have done more than that.

Following an objection, the court ruled that counsel should "not get into side matters at this point", but a few moments later, counsel continued the inquiry:

Q Mr. Surprise, you are really not a stranger to a courtroom; is that right? I mean, you have been in courtrooms before and you have testified before?

MR. MALERBA [plaintiffs' attorney]: Objection, your Honor. He is purposely trying to say things he knows he can't get in.

MR. CLIFFORD [defendant's attorney]: Oh, really.

THE COURT: Well, we have been through this before, but I am not going to preclude counsel from continuing along this line providing that we don't go too far afield into collateral matters. You may proceed, counselor.

Q Mr. Surprise, with regard to your background, you have the background which let me put it this way, you are not exactly pleased with police departments in general; isn't that right?

MR. MALERBA: Objection, your Honor.

THE COURT: I am going to sustain the objection to the form of that question, counselor.

Q Well, sir, on more than one occasion you have had warrants out for your arrest; isn't that right?

MR. MALERBA: Your Honor, that is completely out of line, totally out of line.

The lawyers then accompanied the Trial Judge into the robing room where defense counsel argued that he desired to prove the witness' bad reputation for truth and veracity. The court permitted counsel "to explore this area to some extent" but not if the arrests did not involve convictions. Plaintiffs' request for a curative instruction was denied.

In the courtroom, defense counsel continued:

Q Mr. Surprise, you have appeared in court on more than several occasions before testifying in this case; isn't that right?

A I would say yes.

Q And when you say you would say yes, it's included a number of different allegations, if you will.

MR. MALERBA: If your Honor please —

Q. Isn't that true?

MR. MALERBA: Objection.

THE COURT: As to what specifically, counselor?

MR. MALERBA: Allegations. He is trying to infer something to the jury.

MR. CLIFFORD: I would, to point out that this man is certainly not a stranger to a courtroom.

MR. MALERBA: Here we go, your Honor.

THE COURT: I will reserve on the objection. We will see where we are going. I can't anticipate here. You may proceed, counselor.

A In relation to Dorothea Eggart, she took me to court and after trial she lost the case and I was completely exonerated after trial * * *

Q Did she bring a charge against you?

MR. HAYES [plaintiffs' attorney]: Objection.

"A She brought —

MR. CLIFFORD: (Interposing) He just said it. I didn't ask him that.

THE COURT: There is no conviction here.

MR. CLIFFORD: I will ask it a different way.

THE WITNESS: No conviction after trial.

THE COURT: Very well, let's go on.

Q That was not a civil case, is that right?

MR MALERBA: Your Honor, you said go along, and he is back in it again.

MR. CLIFFORD: Can I ask him what kind of a case it was?

MR. MALERBA: If the man is exonerated, certainly all of this is before the jury and this is ludicrous.

THE COURT: Just a moment. I thought I carefully spelled out the limits in Chambers and on the record. I am going to sustain the objection to the form of the last question.

Q Were you represented — you were represented by counsel on that matter; is that right?

A Yes.

Q And isn't it a fact that that was the firm of Kelly & Jiras? [plaintiffs' law firm].

A No. That is not a fact.

Q Have you been represented by Kelly & Jiras on some of your other matters?

A Never. I never knew them before the time they called me. That was a lover's spat by the way.

Q Have you been in court on other matters involving lover's spats?

A Traffic tickets.

Q Warrants as a result of traffic violations?

MR. MALERBA: Directly opposite your ruling, your Honor. In direct —

MR. CLIFFORD: (Interposing) That's not true, Judge.

THE COURT: You will remember what we discussed in Chambers.

MR. CLIFFORD: I do indeed.

THE COURT: And limit yourself thereby, counselor. I am going to sustain the objection to the form of the last question.

Surprise's cross-examination violated the rules applicable to impeachment and it was clearly prejudicial. Under CPLR 4513, conviction of a crime and the underlying facts of the criminal acts may be used to impeach the credibility

of a witness at a civil trial (*Moore v Leventhal,* 303 NY 534; *Able Cycle Engines v Allstate Ins. Co.,* 84 AD2d 140). Impeachment based on an arrest or indictment alone is improper, however, since they involve mere accusations of guilt (*People v Morrison,* 195 NY 116; *People v Coyne,* 73 AD2d 628; *Landt v Kingsway Equip. Leasing Corp.,* 159 NYS2d 453, affd 4 AD2d 785; Richardson, Evidence [Prince, 10th ed], § 506). While a cross-examiner may not inquire concerning an indictment or arrest, there may be good-faith inquiry concerning a specific immoral, vicious or criminal act, if there is a reasonable factual basis for it (*People v Greer,* 42 NY2d 170; *McQuage v City of New York,* 285 App Div 249; Richardson, Evidence [Prince, 10th ed], § 499). Here, however, counsel's repeated attempts to impeach the witness based upon arrest warrants and criminal charges were not accompanied by any showing that there had been convictions based on these accusations, and no foundation was laid for evidence of any specific acts of misconduct. This prejudice was compounded by the court's initial rulings in defendant's favor and its failure to give a curative instruction as requested by plaintiffs' attorney. Since Surprise's testimony was very important if believed, his credibility or lack of it was a crucial factor in the case. The method by which he was impeached was an error grave enough in scope to have potentially affected the verdict and to warrant consideration of the charge error which itself warrants reversal.

Accordingly, the judgment should be reversed and a new trial granted.

DAMIANI, J. P., MANGANO and THOMPSON, JJ., concur.

Judgment of the Supreme Court, Suffolk County, entered July 15, 1981, reversed, on the law and in the interests of justice, and new trial granted, with costs to abide the event.