OPINION OF THE COURT
Francis T. Collins, J.
The bifurcated trial of this claim took place in Albany, New York, on December 5 and 6, 2001 and the decision herein addresses solely the issue of liability.
The claim seeks to recover money damages for injuries sustained by Sheila Sharrow[1] on February 13, 2000 in a skiing accident at Gore Mountain, a ski resort operated by the New York State Olympic Regional Development Authority at North Creek, New York.
The claimant alleges that while skiing Jug Handle trail at Gore Mountain she unexpectedly came upon a man-made “tabletop” ski jump element which had recently been constructed and concerning which no notice or warning had been provided. The claimant was unable to stop, skied over the element and was injured upon impacting the ground. Claimant alleges that she and her husband had skied Jug Handle trail on February 6, 2000 and that the tabletop jump was not present at that time. The couple returned to Gore Mountain on February 13, 2000 and determined which trails they would ski by examining the 1999-2000 Gore Mountain vacation planner which contains a schematic showing the location and degree of difficulty of each of the mountain’s ski trails (exhibit 1). The brochure designated Jug Handle as a “more difficult” trail,[2] a fact acknowledged by the defendant in its response to the claimants’ notice to admit (exhibit 26).
*22 Jug Handle is a short, semicircular ski trail which one enters from the ski trail known as Showcase. Both Jug Handle and Showcase are rated “more difficult” trails in the 1999-2000 Gore Mountain vacation planner. Jug Handle is wooded on both sides and proceeds in a continuous right-hand curve until it straightens as one exits the trail and re-enters Showcase. Essentially, the claimant contends that Jug Handle did not contain the tabletop element, which she alleges caused her injuries, on her previous trip to Gore Mountain the week prior to February 13, 2000; the element was constructed sometime between February 6 and 13, 2000; that the defendant failed to provide notice that the element was present and that the degree of difficulty of Jug Handle had been upgraded from “more difficult” to “most difficult” and that as an intermediate skier she would not have skied Jug Handle had such notice been provided.
Specifically, claimant alleges that notice of the presence of the element and revised level of difficulty should have been provided, and was not, in the 1999-2000 Gore Mountain ski brochure, at the central information board maintained at the ski center as required by General Obligations Law § 18-103 (5) (d) and on signage required to be posted at each lift line pursuant to General Obligations Law § 18-103 (11). Additionally, claimant alleges that no sign was posted at the entrance to Jug Handle indicating the presence of the tabletop element and denoting the trail as “most difficult” or, alternatively, that if a sign was present it was inadequate. Finally, claimant alleges that the defendant failed to conspicuously mark the presence of the element on the trail as required by General Obligations Law § 18-103 (4).
Prior to the trial each party moved for summary judgment on the issue of liability. Those motions were denied in a decision and order dated November 21, 2001 based upon the court’s finding that there were material issues of fact requiring a trial. By order to show cause executed November 30, 2001 the defendant moved for leave of court to amend its answer to specifically include the affirmative defense of claimant’s assumption of risk under both the common law and article 18 of the General Obligations Law. Claimants’ attorney indicated on the record that claimant did not oppose the motion and it was, therefore, granted.
*23 Claimants’ first witness was William Meehan, the brother-in-law of Charles Sharrow. He described Sheila Sharrow as a “strong intermediate” skier (trial transcript at 21) and verified that he and the claimants had skied Gore Mountain together on February 6, 2000 though he could not recall having skied Jug Handle trail on that occasion. The witness testified that in his experience Sheila Sharrow would ski a black diamond (most difficult) trail on very rare occasions and only after Charles Sharrow skied the trail first and then shared his observations with Sheila. If Mr. Sharrow determined that the trail was within Sheila’s level of ability he would reski the trail with her telling her which side of the trail to be on and what hazzards to avoid (transcript at 27). Meehan alleged that the Sharrows followed this procedure every time Sheila skied a black diamond trail.
Charles Sharrow testified that he and his wife Sheila arrived at Gore Mountain on February 13, 2000 between noon and 12:30 p.m. Charles had a season pass and Sheila purchased a ticket and the two began skiing between 12:30 and 1:00 p.m. The witness testified that he and Sheila did not plan to ski any black diamond (most difficult) trails that day. He alleges that they consulted the enlarged trail map attached to the wall of a building at the Adirondack Express chair lift (as depicted in the photos received in evidence as exhibits 32-37) to determine which trails they were going to ski and what routes they were going to take (transcript at 45).
At approximately 3:00 p.m. he and Sheila arrived at the Saddle Lodge via the Adirondack Express chair lift. They stayed at the lodge between 15 and 30 minutes having hot cocoa and examining a trail map which they had obtained upon their arrival at Gore earlier that day (transcript at 51). Although the witness indicated that he and his wife did not decide to ski Jug Handle trail during their stay at Saddle Lodge, he recalled that Jug Handle was designated on the trail map they examined that day as a more difficult or blue square trail.
He testified further that after leaving the Saddle Lodge he and Sheila proceeded to ski down Showcase trail at a moderate rate of speed until Sheila yelled out to him to take the Jug Handle trail, the entrance to which was on his left. He proceeded onto the trail which begins to curve sharply to the right approximately 40 feet inside the trail entrance. The witness did not observe any signs, warnings or posters upon entering the trail. He was approximately 15 to 20 feet from the *24 jump when he first observed it and estimated his reaction time from discovery to take off at two seconds. He successfully navigated the jump which was located in the middle of the trail and which he described as being approximately 12 feet wide, quite long and as tall as the witness who stands 5 feet 10 inches (transcript at 59). The witness testified that he then turned around to wait for Sheila and saw her lying at the “bottom of the off ramp” of the jump. Charles Sharrow testified that there were no signs, poles or posts in place to indicate the location or existence of the ski jump (transcript at 62-63) and that at the request of one of the ski patrollers who arrived at the scene following his wife’s accident he placed his wife’s skis in crossed fashion on the ramp to prevent other skiers from going over the jump.
Charles Sharrow stated that he returned to Gore Mountain on March 8, 2000 to take photographs (exhibits 19-22) which were received in evidence without objection. Exhibit 10 is a photograph of the Jug Handle trail sign in place on March 8, 2000 although the witness testified that he did not recall seeing the sign on February 13, 2000.
Charles Sharrow further testified that he and Sheila had skied Showcase and Jug Handle trails the weekend prior to the accident on either Saturday, February 5, or Sunday, February 6, 2000, and that on that occasion Jug Handle trail did not contain a jump. He stated that he had looked at a trail map on that occasion and knew that Jug Handle’s degree of difficulty was designated as a blue square (more difficult) trail. Mr. Sharrow testified that had he been aware that Jug Handle was designated as a black diamond (most difficult) trail on February 13, 2000 he would have skied it first before allowing his wife to ski the trail. The witness alleged that the pole with the orange circle marking the jump as shown on exhibits 19, 20 and 21 was not present on February 13, 2000 and that there was no coloring on the snow to indicate the presence of the jump.
On cross-examination Charles Sharrow acknowledged that while at Saddle Lodge on the afternoon of the accident he and Sheila did not specifically discuss skiing Jug Handle and did not look at the trail map to determine Jug Handle’s degree of difficulty. The witness stated that on prior occasions he had seen a trail sign for Jug Handle which contained a blue square (more difficult) designation but that he did not observe such a sign on the date of the accident. In reference to exhibit 10, a photograph showing a trail sign located to the right of the *25 entrance to Jug Handle trail, the witness acknowledged that it was a large yellow sign indicating that Jug Handle was a “most difficult” trail and contained both a black diamond and a written warning stating “[t]his trail contains one or more of the following elements: 1 — Table Top, 2 — Double Jump; Look Before You Leap.” He estimated the sign to be approximately IV2 feet by 3 feet and noted that it was fastened to a tree.
Charles Sharrow further admitted that prior to skiing on February 13, 2000 he did not consult the main information board at Gore Mountain or the postings located thereon. In fact, he stated that he did not believe that he ever consulted the main information board at Gore prior to skiing. He did not inquire of anyone at Gore as to what the snow or ski conditions were or if there had been any modifications to any of the trails. He also admitted that he never read the New York State Warning to Skiers.
Exhibits 12 and 13 (ski trail condition reports) and exhibits 8 and 18 (snow condition reports for February 12 and 13, 2000) were received in evidence without objection.
On redirect examination the witness testified that on both exhibit 8 and exhibit 18 Jug Handle was listed as a blue square (more difficult) trail and that neither document indicated that Jug Handle had been upgraded to a black diamond (most difficult) trail. The same was true with regard to exhibits 12 and 13. The witness testified that during his 10 to 15 prior visits to Gore during the 1999/2000 season he had always consulted a trail map and that on each of those occasions Jug Handle was designated as a blue square trail. He further stated that he had skied Jug Handle between 5 and 10 times prior to February 13, 2000 and had never encountered a man-made jump on any of those occasions.
On re-cross-examination the witness acknowledged that he did not consult either exhibit 8 or 18 before skiing Jug Handle on February 13, 2000 and further stated that he had not skied Jug Handle on February 13, 2000 prior to the time of his wife’s accident.
Photographic exhibits 12a, 14b, 14c, 23, 24, 25 and the claimant’s accident report (exhibits 2a and 2b) were offered into evidence and received without objection.
Sheila Sharrow’s testimony regarding her activities upon arriving at Gore Mountain on the afternoon of February 13, 2000 was essentially indistinguishable from that of her husband. She related, however, that she began skiing in March of 1999 *26 and had skied seven or eight times during the remainder of what would have been the 1998/1999 ski season. During the 1999/2000 season prior to the date of her accident she allegedly skied approximately 10 times and considered herself to be an intermediate skier. Ten to 12 of her skiing experiences during those two seasons took place at Gore and she recalled having skied Jug Handle trail on one previous occasion, the Sunday prior to her accident, at which time she contends there was no man-made jump on the trail.
The witness acknowledged that while she generally skied green circle (easier) and blue square (more difficult) trails, she had also skied black diamond (most difficult) trails with her husband’s aid and advice. She reported that on one occasion she had even skied the terrain park located on the lower Sleigh Ride trail at Gore but had proceeded cautiously and never took any jumps prior to her accident. She expressed some familiarity with the signage found in a terrain park and stated that there was no such signage on Jug Handle on February 13, 2000.
On the day of her accident claimant recalled skiing only blue square (more difficult) trails. She could not recall having skied any black diamond (most difficult) trails that day. While resting at Saddle Lodge that afternoon she recalled looking at either the trail map or the vacation planner map while deciding which trails she and her husband would ski for their last run or next to last run of the day. She recalled seeing that Jug Handle was designated on the map as a blue square trail (transcript at 132) at some point during the day on February 13, 2000 but could not say with certainty that she noted Jug Handle’s degree of difficulty on the map while at Saddle Lodge before her final descent. She testified that she and her husband decided to ski down Showcase trail, left the lodge and proceeded down the mountain. As the couple skied down Showcase Mrs. Sharrow yelled to her husband to take Jug Handle which she believed from her recollection of the trail map and the enlarged map on the side of the Adirondack Express chair lift building (transcript at 135) to be a blue square or “more difficult” trail.
Mrs. Sharrow testified that she skied down Showcase that afternoon at an even pace and was in control of her movements as she slowed to enter Jug Handle. According to her testimony, the claimant successfully negotiated the right-hand curve and suddenly came upon the ramp leading to the tabletop jump. Ms. Sharrow testified that she was shocked to see the jump, was unable to move right or left to avoid it and did not have *27 sufficient opportunity to stop. She stated that she has no recollection of going over the jump but recalls waking up on the ground on the downhill side of the jump.
Claimant further testified that she did not observe any sign at the head of the trail designating Jug Handle’s degree of difficulty on either February 6, 2000 or on the date of her accident (transcript at 140). Nor was she aware of any pole or post marking the jump as she approached it (transcript at 145). The witness stated that she observed nothing at the Adirondack Express lift area which indicated that Jug Handle trail contained a jump element or that its level of difficulty had been upgraded from a blue square to a black diamond. She saw nothing in Gore Mountain’s brochure (i.e., vacation planner) to indicate the presence of a jump or the upgrading of Jug Handle and she neither heard a public address announcement to that effect while at the base lodge or Saddle Lodge nor saw any written notification posted at those locations regarding Jug Handle trail being upgraded or having a jump element (transcript at 134). She indicated that had she been made aware of the presence of the jump element on Jug Handle she would not have skied it without having her husband ski the trail first. At the conclusion of claimant’s direct testimony counsel for each party stipulated to the fact that claimant was injured as a result of her accident.
On cross-examination claimant expressed an appreciation of the risks of injury from skiing but denied being familiar, with the Warning to Skiers posted at the ticket vending area of Gore Mountain (transcript at 149-151) or printed on tickets issued by the facility. She indicated a general awareness of the location of the main information board but did not remember consulting the information board or any snow or trail condition reports on the date of her accident. She acknowledged that she did not affirmatively seek out information from Gore Mountain employees regarding any trail changes or modifications (transcript at 157). Claimant and defense counsel engaged in the following exchange at page 158 of the transcript:
“Q. Now, you indicated that you had skied Jug Handle on one previous occasion, is that also correct?
“A. Yes.
“Q. Do you recall what the sign was that was at the top of the trail on that trail on the previous occasion when you’d [sic] skied it?
“A. No.
*28 “Q. Did you look for a sign at the top of Jug Handle to determine whether or not it represented or advised you of a degree of difficulty?
“A. I didn’t, no.
“Q. And you’ve indicated already that you don’t— you never saw a sign at the top of that trail on the day that you were injured, is that correct?
“A. Correct.”
Claimant repeated her testimony given on direct examination that she was unable to avoid the jump on Jug Handle and stated that she made no effort to stop before rounding the turn immediately prior to it. She indicated that although she did not see a pole marking the jump during the two seconds she had to make any such observation, its presence would have had no effect on her time to respond to the presence of the jump nor would it have changed the distance available in which to stop or avoid the jump. In reference to exhibit 21 (photograph of Jug Handle taken by Charles Sharrow on March 8, 2000) the witness testified that she did not see the open areas depicted therein on either side of the jump on February 13, 2000 (transcript at 168).
On redirect examination claimant stated that prior to her accident she had obtained information regarding Jug Handle’s level of difficulty from the Internet and from trail maps. She averred that Jug Handle trail was designated as a blue square on the Gore Mountain Web site and that no information was posted regarding the presence of a jump on that trail. She testified further that she likewise received no notice or warning from the brochure she consulted (claimant’s exhibit 1). The claimants rested at the conclusion of Sheila Sharrow’s testimony after exhibit 7, a diagram of various jump elements, was received without objection.
Defendant moved to dismiss the claim for claimant’s failure to prove a prima facie case of negligence due to the absence of expert testimony regarding signage necessary to satisfy the defendant’s statutory duty and the absence of such testimony showing the manner by which a ski trail’s degree of difficulty is determined. Counsel also moved to dismiss on the ground that claimant assumed the risk of her injury pursuant to General Obligations Law article 18.
Claimant’s counsel opposed the motion citing various provisions of article 18 of the General Obligations Law as giving rise to a duty on the part of the defendant and referencing the testimony of defendant’s employees at examinations before *29 trial, the transcripts of which were received in evidence at trial. Counsel also addressed the issue of assumption of risk arguing that one is charged with assuming only those risks which are inherent in the sport and that the placement of a jump element immediately after a turn on a trail designated as more difficult (blue square) is not an inherent risk of the sport.
The court reserved decision on the motion and allowed the parties to submit posttrial briefs.
The defendant’s first witness was Emily Stanton, Gore Mountain’s public relations and events coordinator, who testified regarding her involvement in the production of promotional materials including rack brochures, trail maps and vacation planners. Ms. Stanton related that a contract for production of the various promotional materials is entered into in March so that the materials are available for distribution by October each year. She further testified regarding the costs of production and area of distribution of the printed material and stated that once the materials are distributed they cannot be reacquired (transcript at 194). She further estimated that if changes in the materials were required it would take three to four weeks to reproduce the altered material and would likely cost approximately $50,000 to redesign, reprint and redistribute the planners, maps and brochures. Exhibits H through Q were received in evidence without objection.
On cross-examination the witness acknowledged that all trail maps for the 1999/2000 season would have indicated that Jug Handle was a blue square trail (transcript at 201). She admitted that during the 1999/2000 season she never placed stickers or labels on any trail maps, vacation planners or brochures made available to the public at the facility to indicate that Jug Handle had been upgraded from a blue square to a black diamond (transcript at 203) or to indicate that Jug Handle contained a jump element (transcript at 204). She also admitted that she made no changes to the Gore Mountain Internet Web site regarding Jug Handle’s upgrade from a blue square to a black diamond trail despite admitting that “we often do it * * * ” and that the degree of difficulty designation could have been changed simply by contacting the Web site designer (transcript at 206). The witness noted that despite a designated spot for special notes on the snow condition reports prepared daily or even more frequently depending on weather conditions that no special note was made of the fact that Jug Handle had been upgraded to a black diamond trail (transcript at 208-210). Referring to exhibits 8 and 18, the witness acknowledged that *30 on the snow condition reports for February 12 and 13, 2000 Jug Handle was designated a blue square or intermediate trail (transcript at 210). The witness claimed no responsibility for ordering the enlarged trail maps located at the information desk in the main lodge, the central information board outside the first aid area or other locations within the resort. In fact she testified that while the printed promotional material changed every year the large outdoor signs were not changed as frequently.
The witness could not recall having seen Jug Handle designated on any of the large maps as anything other than a blue square trail nor did she recall hearing any public address system announcements during her working hours advising skiers of an upgrade of Jug Handle’s level of difficulty.
The defendant’s second witness was Thomas John Rausch, Gore Mountain’s grooming and trail supervisor. Rausch testified that in mid-January 2000 he was directed by Gore Mountain’s general manager Mike Pratt to build a tabletop jump element on Jug Handle trail. The witness described the process of constructing the jump which involved making a large pile of man-made snow using the facility’s snow guns, allowing the manufactured snow to leach some of its high water content and then moving the snow into position by means of a piece of heavy equipment known as a piston bully. Rausch attempted to pinpoint the date the jump element on Jug Handle was constructed from grooming records which indicated a request to groom, till and blade Jug Handle on January 18, 2000 (exhibit 7) and from an invoice for a new windshield for one of the piston bullies (defendant’s exhibit W) dated January 20, 2000 which he alleges was damaged by a groomer attempting to move a large pile of man-made snow on Jug Handle while constructing the jump (see, transcript at 228, 241). The witness claimed that he thereafter took over the construction of the jump himself spending between two and four nights in the process (transcript at 232) although he did not specify the actual date on which construction of the jump was completed.
The witness described the “tabletop element” as being roughly 14 to 16 feet wide with feathered sides and a trail maintenance road used for grooming purposes located to the left of the jump (transcript at 234, 235). He recognized exhibits 19 and 21 previously received in evidence as photographs of the jump, and testified that once the element was constructed it would be maintained until management directed the witness to take it down (transcript at 236).
*31 Rausch went on to describe the nightly grooming process which involved the removal of temporary signs and flags and element markers such as bamboo poles topped with orange disks. He testified that it was not a groomer’s responsibility to replace the signs or markers upon completion of the grooming process. Permanent signs, such as the trail sign for Jug Handle depicted in exhibit X, were lag bolted to trees and would not be removed as part of the grooming process. The witness does not recall what type of sign was in place at the head of Jug Handle trail on the night of February 12, 2000.
On cross-examination Thomas Rausch testified that although Jug Handle was not a new trail it had never had a terrain element (jump) until the 1999/2000 season. Although he testified that a terrain park generally has more than one element he responded in the affirmative to a question concerning whether he and the general manager were attempting to build a terrain park on Jug Handle (transcript at 248-249). The witness admitted that he could not provide an exact date for the completion of the tabletop element (transcript at 252) but grooming records indicate that tiller and blade work was performed on Jug Handle by someone other than the witness on February 9 and 11, 2000 and that grooming work was performed on that trail on February 12, 2000 (transcript at 257). Those records do not establish that the witness was present on Jug Handle on any of the aforementioned dates.
Rausch testified that he placed the jump on Jug Handle in his discretion without any formal guidelines (transcript at 261). The witness’ direct examination concluded with an acknowledgment that he did not recall seeing the Jug Handle trail sign (claimant’s exhibit 10) prior to the date of the claimant’s accident.
On redirect examination the witness stated that once constructed the tabletop element could be knocked down and rebuilt within two to three hours. Mr. Rausch did not recall a time during the 1999/2000 ski season at which the jump element was removed from Jug Handle and, in fact, he stated that it was still in place at the end of the skiing season.
Rausch indicated on re-cross-examination that he could have placed the jump further down the straightaway but did not. He also agreed that the grooming schedules demonstrated that prior to the accident he was last on Jug Handle on January 31, 2000.
Mark Anderson, Gore Mountain’s ski patrol director, was the defendant’s next witness. Among the duties described by the *32 witness was the posting of permanently mounted trail head signs including the sign at the entrance to Jug Handle which he personally designed. He described the sign making process as involving Gore Mountain employees who prepared and painted the blank sign and an outside vendor who manufactured the vinyl lettering which was affixed to the painted sign. He identified exhibit 16 as a computer rendition of his design received from the sign maker for approval prior to manufacture of the lettering. Anderson further testified that he along with another ski patroller, Don Townley, installed the sign on February 10, 2000 using 3-inch or 4-inch lag bolts to affix the sign to a tree at the entrance to Jug Handle. Placement of the sign was noted in the Saddle log for February 10, 2000 maintained by the Gore Mountain ski patrol at its Saddle patrol facility and evidenced by defendant’s exhibit 17 which was received in evidence without objection (transcript at 297). The witness stated that once installed on February 10, 2000 the new Jug Handle trail sign remained in place until fall 2000. Exhibits 10 and 22 depict its relative size and placement at the entrance to Jug Handle trail.
The sign itself (exhibit Z) is painted chrome yellow, is approximately 32 inches wide and 48 inches high and contains a white inner surface measuring 14 inches by 21 inches on which there is a black diamond measuring 12V2 inches point to point and the words “most difficult” in block lettering 2V2 inches to 3 inches in height. Beneath are written the following words: “This trail contains one or more of the following elements: 1 — Table Top, 2 — Double Jump; Look Before You Leap.” The style of the lettering is the same as set forth in claimant’s exhibit 16 described above.
The witness testified that all required signs “were absolutely up at the trail heads” (transcript at 300-302) on the date of claimant’s accident.
During his direct testimony Mark Anderson also testified regarding his actions after being notified of claimant’s accident on February 13, 2000. He reported to the scene and noted that Sheila Sharrow was already being attended by experienced members of the ski patrol (transcript at 311). He viewed the accident scene from atop the tabletop element and observed that the jump was marked by a monopod, a marker consisting of an eight-foot orange bamboo pole topped by an eight-inch diameter blaze orange plastic disk, the use of which was described as a general practice at Gore Mountain at that time.
On cross-examination the witness conceded that Jug Handle trail was upgraded from a blue square to a black diamond trail *33 on February 10, 2000 when the new trail sign was installed. The upgrade was for safety reasons and resulted from the addition of the terrain element to the trail (transcript at 330-331). The witness did not recall any discussion regarding the degree of difficulty upgrade with Gore’s general manager and, in fact, believed that he took it upon himself to install the sign upgrading the trail’s designated level of difficulty (transcript at 331). He further acknowledged that Jug Handle trail had never contained a terrain element prior to the 1999/2000 season.
The witness testified that on the date of the claimant’s injury all of the enlarged trail maps at the facility including the base lodge, main information board and at the Adirondack Express chair lift designated Jug Handle as a blue square trail (transcript at 335-339), as did the trail maps, brochures and vacation planners in use during the 1999/2000 season. Anderson stated that he never advised the staff nor directed anyone to advise staff to inform the public that Jug Handle contained a jump element. He never heard public address announcements regarding the upgrading of Jug Handle’s level of difficulty (transcript at 342) and never saw any posting at Gore Mountain advising the public that the degree of difficulty of any trail was subject to change (transcript at 345). The witness did not place multiple signs on Jug Handle identifying the trail as inherently dangerous nor did he or any of the ski patrollers insert on the trail condition reports any indication that Jug Handle had been upgraded as of February 13, 2000 (transcript at 351). Anderson testified that while he knew that the Jug Handle trail opened for the season on January 20, 2000 he did not know the exact date that the jump was created on the trail (transcript at 357). The witness was reminded of testimony given at an examination before trial held on March 20, 2001 at which he responded in the negative to a question as to whether Jug Handle had any such element on it during January 2000 (transcript at 357-358). Although the witness did not recall seeing the sign (exhibit Z) at the head of Jug Handle when he responded to the report of claimant’s accident he was unwavering in his position that the sign was in place at that time. He confirmed that the new sign had been mounted in the same location where the prior trail sign for Jug Handle had been (transcript at 367).
On redirect examination the witness stated that he was not looking for the sign while proceeding to the scene of the accident.
Michael Pratt, the general manager of Gore Mountain, was called as the defendant’s next witness and testified regarding *34 snowmaking operations on Showcase trail during January 2000 in relation to the creation of the terrain element on Jug Handle. His testimony, however, does not establish the date on which the jump element was added to the trail. The witness identified exhibit Z as the trail sign posted at the entrance to Jug Handle and the exhibit was received in evidence without objection.
On cross-examination Michael Pratt acknowledged that he directed the placement of a terrain element on Jug Handle during the 1999/2000 season (transcript at 390) but did not provide his grooming supervisor (Thomas Rausch) with any guidelines or specifications to be used in constructing the element (transcript at 391). The witness admitted that during the 1999/2000 season Gore Mountain designated the degree of difficulty of each trail on its trail maps so that skiers could decide which trails were within their individual levels of expertise. He further admitted that all trail maps in use on February 13, 2000 listed Jug Handle as a blue square trail (transcript at 395) and that he never directed anyone to make any changes in the resort’s Web site or to any of the enlarged trail maps to indicate a change in Jug Handle’s degree of difficulty. He never directed anyone to manufacture stickers or labels to be placed on brochures or other promotional materials noting the change in Jug Handle’s degree of difficulty.
Like the defendant’s prior witness, Michael Pratt was unable to specify a date on which the jump was added to Jug Handle.
The defendant’s final two witnesses were Robert Heunemann, a seven-year member of Gore Mountain’s ski patrol, and John Howard Carbone, a ski patrol supervisor at the resort. Both men testified that they played a part in maintaining the logbook at Saddle patrol on February 10, 2000 (defendant’s exhibit 17), with most entries being made by Heunemann. The notation regarding the installation of the new Jug Handle trail sign at 9:45 a.m. on that date, however, was made by Carbone. Claimant did not cross-examine either witness.
At the conclusion of this testimony the defendant rested and renewed its dismissal motion made at the close of claimant’s proof and further requested reconsideration of the defendant’s motion for summary judgment.
Each of those requests is hereby denied.
Both claimants testified that the jump element was not present on Jug Handle when the couple skied the trail on February *35 6, 2000. The court fully credits the claimants’ testimony in this regard despite an attempt by the defendant to show that the jump was created prior to February 6, 2000 (see testimony of Michael Pratt and Thomas Rausch).
So too, despite claimants’ failure to notice the new Jug Handle sign at the entrance to Jug Handle on the date of the accident, the court found the testimony of Mark Anderson, Robert Heunemann and John Carbone to be credible and to have established that the new Jug Handle sign (exhibit Z) correctly stating its upgraded level of difficulty was installed at the head of the trail on the morning of February 10, 2000, three days prior to Sheila Sharrow’s accident.
These findings are significant to the determination and apportionment of liability in this case.
The defendant as a ski area operator is subject to certain duties imposed by the Safety in Skiing Code (General Obligations Law § 18-101 et seq.). The statutory duties are not exclusive and common-law principles must be applied unless a particular hazardous condition is specifically addressed by the statute (Sytner v State of New York, 223 AD2d 140). In this case claimant has alleged that the defendant breached duties imposed by both the Safety in Skiing Code and the common law.
Claimants argue in their posttrial brief as they argued on the prior summary judgment motion that the defendant violated subdivision (5) of section 18-103 of the General Obligations Law which, in pertinent part, provides:
“Every ski area operator shall have the following duties: * * *
“5. To maintain in a central location at the ski area an information board or boards showing at a minimum the following: * * *
“d. the relative degree of difficulty of each slope or trail (at a minimum easier, more difficult, most difficult); and
“e. the general surface condition of each slope and trail as most recently recorded in the log required to be maintained by subdivision six of this section. íjí * * ”
They further argue that these statutory provisions were intended to prevent the type of accident which caused Sheila Sharrow’s injuries and that the violation thereof constitutes negligence per se (citing PJI3d 2.26; Martin v Herzog, 228 NY *36 164; Goode v Meyn, 165 AD2d 436; Elliott v City of New York, 95 NY2d 730; Van Gaasbeck v Webatuck Cent. School Dist. No. 1, 21 NY2d 239).
As this court noted in its decision and order of November 27, 2001 addressed to the parties’ summary judgment motions more must be shown. A finding of negligence per se does not equate to a determination of liability per se; an injured party must still establish that he or she is within the class sought to be protected by the statute and that “the statutory violation was [a] proximate cause of the occurrence” (Dance v Town of Southampton, 95 AD2d 442, 445-446). This court further noted that “[e]vidence of negligence is not enough by itself to establish liability. It must also be proved that the negligence was the cause of the event which produced the harm sustained” (Sheehan v City of New York, 40 NY2d 496, 501; 1A Warren, Negligence in New York Courts § 5.12 [7] [Proximate Cause]).
The proof offered at trial establishes that on the date of the accident the defendant failed to correctly and accurately indicate the degree of difficulty of Jug Handle trail on any centrally located information boards at the ski area as required by subdivision (5) of section 18-103 and that such failure constituted negligence per se. The proof, however, does not demonstrate that the failure to correctly list the trail’s modified and upgraded degree of difficulty on the information boards was a competent producing cause of the injuries sustained.
Both Sheila Sharrow and Charles Sharrow testified that neither of them consulted the main information board at Gore Mountain prior to skiing on February 13, 2000 (see Charles Sharrow’s trial testimony at 96; Sheila Sharrow’s trial testimony at 156). Despite the negligence arising from the defendant’s failure to correctly list the degree of difficulty of Jug Handle on the centrally located information board on the date of the accident such negligence cannot be said to be a competent producing cause of Sheila Sharrow’s injuries. Since claimant did not consult the board on that date liability cannot be predicated upon the defendant’s failure to post the required information in violation of section 18-103 (5) (d) of the General Obligations Law.
Finally, the proof offered at trial failed to establish the claimants’ allegations asserting a violation of General Obligations Law § 18-103 (5) (e).
As previously noted, claimants also seek to predicate liability upon the defendant’s alleged violation of subdivision (11) of section 18-103 of the General Obligations Law which states:
*37 “Every ski area operator shall have the following duties: * * *
“11. To post in a conspicuous location at each lift line a sign, which shall indicate the degree of difficulty of trails served by that lift with signs as shall be specified by the commissioner of labor pursuant to section two hundred two-c or eight hundred sixty-seven of the labor law.”
This requirement is reiterated using similar language in 12 NYCRR 54.6, which provides as follows:
“Section 54.6 Signs and destinations.
“(a) Ski area operators shall conspicuously post and maintain signs, including legends and symbols, in the sizes, colors and locations required by provisions of Table I.
“(b) Lift signs. At each lift line there shall be posted in a conspicuous location a sign which shall indicate the degree of difficulty of trails served by that lift in accordance with the difficulty designations in Table I.”
The photographic and testimonial evidence demonstrates that Gore Mountain satisfied this statutory requirement at least in regard to the Adirondack Express chair lift which was the only lift identified as having been used by the claimants on February 13, 2000. As set forth above, the law requires that a sign be posted in a conspicuous place at each lift line indicating the degree of difficulty of trails served by the lift. Exhibit 34, a photograph of the Adirondack Express lift, quite clearly shows the presence of a sign containing the following information: “Welcome to the Adirondack Express Triple Chair servicing More Difficult and Most Difficult Trails.”
Claimants have asked the court to interpret subdivision (11) of section 18-103 as requiring the defendant to post maps rather than signs at the lift and to designate thereon the degree of difficulty of each and every trail served by the lift. It is well established that “courts are obliged to interpret a statute to effectuate the intent of the Legislature, and when the statutory ‘language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of [the] words’ used.” (People v Finnegan, 85 NY2d 53, 58 [citations omitted]; see also, McKinney’s Cons Laws of NY, Book 1, Statutes §§ 76, 92 [a], [b]; Matter of Auerbach v Board of Educ. of City School Dist. of City of N.Y., 86 NY2d 198.) Under such circumstances “resort need not be had to other means of interpretation” *38 (Statutes § 76, at 168; see also, Statutes § 92 [b], at 182). It is also well settled that a court may not legislate under the guise of interpretation. A statute must be “read and given effect as it is written by the Legislature, not as the court may think it should or would have been written if the Legislature had envisaged all the problems and complications which might arise” (Parochial Bus Sys. v Board of Educ. of City of N.Y., 60 NY2d 539, 548-549, quoting Lawrence Constr. Corp. v State of New York, 293 NY 634, 639).
In the instant case, the language used in General Obligations Law § 18-103 (11) is plain, clear and unambiguous on its face. There is no direction to ski area operators to post trail maps of any size in a conspicuous place at the lift line setting forth the specific degree of difficulty of each and every trail which can be accessed by use of that particular lift. Under the rules of statutory construction set forth above, this court may not impose such a requirement as the legislative prescription at issue here is restricted to the posting of a sign indicating the degree of difficulty of trails served by that lift. The sign in place at the Adirondack Express chair lift at Gore Mountain on February 13, 2000 satisfied that requirement and no statutory violation in that regard is found.
Claimants further argue that the defendant violated subdivision (4) of section 18-103 which imposes the following additional duty upon ski area operators:
“4. To conspicuously mark with such implements as may be specified by the commissioner of labor pursuant to section eight hundred sixty-seven of the labor law, the location of such man-made obstructions as, but not limited to, snow-making equipment, electrical outlets, timing equipment, stanchions, pipes, or storage areas that are within the borders of the designated slope or trail, when the top of such obstruction is less than six feet above snow level.”
Claimants urge the court to consider the tabletop element constructed by Gore Mountain employees on Jug Handle trail to be a “man-made obstruction” requiring a conspicuous marker specified by the Commissioner of Labor pursuant to Labor Law § 867 and what claimants’ attorney refers to as Labor Law Code 54 (arguably 12 NYCRR 54.5 [d] the language of which mirrors that of General Obligations Law § 18-103 [4]). Such a construction is not, however, warranted by either the statute or the regulation. While the statutory provision at issue *39 contains the words “but not limited to,” the legislatively enumerated items requiring conspicuous markings are all objects not directly related to the sport of skiing and from which skiers should be protected rather than a man-made element designed for use in the sport such as a ski jump. Application of the doctrine of noscitur a sociis, a rule of statutory construction under which words employed in a statute are construed and their meaning is ascertained by reference to the words and phrases with which they are associated, compels the conclusion that a tabletop jump element constructed on a ski trail falls outside the scope of the statute (see, McKinney’s Cons Laws of NY, Book 1, Statutes § 239; State of New York v Wal-Mart Stores, 207 AD2d 150). Accordingly, the court does not find the jump constructed on Jug Handle to be a man-made obstruction of the type requiring a marker pursuant to General Obligations Law § 18-103 (4).
More importantly, in this case the court concludes that the testimony of ski patrol director Mark Anderson that the blaze orange monopod was in place at the jump when he arrived at the scene immediately following the accident was entirely credible. The testimony of coclaimant Charles Sharrow regarding the placement of Sheila Sharrow’s crossed skis at the head of the jump following his wife’s fall as directed by the ski patroller is not in this respect inconsistent. The direction to place the skis upon the ramp can reasonably be viewed as an attempt to protect Mrs. Sharrow from further injury by skiers using the jump while she lay prone at its base and not as an effort to mark the jump’s location in the absence of a monopod.
The court is likewise unpersuaded by the Sharrows’ testimony that neither of them observed the monopod at the jump prior to the accident. Both Charles and Sheila Sharrow testified that they had approximately two seconds to observe the area before they encountered the jump. The court as factfinder credits the testimony of Mr. Anderson that the monopod was present to mark the jump and consequently finds that even if General Obligations Law § 18-103 (4) applied, the jump in place on Jug Handle on February 13, 2000 was marked as required and no statutory violation occurred.
Claimants in their posttrial brief also seek to predicate defendant’s liability upon the theory that the tabletop element on Jug Handle was constructed negligently. While premises liability against an owner of property may clearly result from a defect in the design or construction of premises (see, Quinlan v Cecchini, 41 NY2d 686; Thomassen v J & K Diner, 152 AD2d *40 421; Ramsammy v City of New York, 216 AD2d 234), claimants offered no expert testimony to establish that the jump element on Jug Handle was designed or constructed in a negligent manner. Expert testimony is appropriate to “clarify a wide range of issues calling for the application of accepted professional standards” (Selkowitz v County of Nassau, 45 NY2d 97, 102). The defendant’s admitted failure to provide guidelines for the construction of the Jug Handle jump to Gore Mountain’s grooming supervisor does not establish such a defect; nor does the fact that the jump was constructed in the middle of the trail immediately following a curve. Claimants have not shown that the jump was placed or constructed in a manner which violated ski industry standards or was otherwise inherently dangerous. Absent expert testimony the court cannot find under the circumstances present here that the Jug Handle trail jump was negligently designed or constructed.
Although as noted above the court finds no statutory basis for imposing liability against the defendant, the court does find that the defendant breached its common-law duty to adequately warn claimant of the addition of a jump element to a previously designated blue square (more difficult) trail which as recently as one week prior to the accident contained no such element. Here the element was added part way through the skiing season and approximately three weeks after Jug Handle trail was opened for the season according to Mark Anderson, Gore’s ski patrol director. While the court credits Anderson’s testimony that the large yellow trail sign (exhibit Z) was installed on February 10, 2000, three days prior to the accident, that is not alone sufficient to avoid liability especially in light of Michael Pratt’s testimony that it was not uncommon for skiers at Gore Mountain to ski directly from one trail onto an adjoining trail without stopping to take notice of the trail head sign. Although the Jug Handle sign posted at the entrance to the trail on the date of the accident correctly listed the trail’s revised level of difficulty, the ski area made no additional effort to warn skiers of this significant change.
The testimony clearly shows that there were both means and opportunity for the defendant to warn skiers that Jug Handle’s designation had changed but no postings were made, no public address announcements were issued, no labels were attached to trail maps, vacation planners or brochures, no inserts were handed out at ticket windows and no information was provided on the facility’s Internet Web site. The sole notice of the change in Jug Handle’s level of difficulty was the trail sign itself. More *41 over, because of the curving nature of the trail the jump element itself was not visible until a skier had negotiated a right-hand curve. Absent notice of the change, skiers, especially those who had skied the trail previously during the ski season and prior to the addition of the jump, had every reason to suspect that the trail remained a more difficult rather than a most difficult trail containing a jump. The defendant’s modification thus created a trap for the unwary and the defendant’s failure to adequately notify skiers of the change must be found under the circumstances of this case to be a competent producing cause of the claimant’s injury. Liability thus attaches.
At trial the defendant offered no proof of its assertion that Sheila Sharrow violated the duty imposed by General Obligations Law § 18-105 (4) which requires a skier “[t]o remain in constant control of speed and course at all times while skiing so as to avoid contact with plainly visible or clearly marked obstacles and with other skiers and passengers on surface operating tramways.” Sheila Sharrow’s accident was unwitnessed, even by the coclaimant, and the court finds her testimony regarding her speed and control immediately prior to encountering the jump on Jug Handle to be credible. Moreover, because the jump was located at the end of a bend in the trail it cannot reasonably be construed to constitute a “plainly visible” or, for purposes of section 18-105 (4), “clearly marked” obstacle.
Additionally, the proof does not support the conclusion that claimant violated subdivision (5) of section 18-105 which sets forth a skier’s duty “[t]o familiarize [himself or herself] with posted information before skiing any slope or trail, including all information posted pursuant to subdivision five of section 18-103 of this article.” As the evidence demonstrates that all information posted by the facility other than the trail head sign incorrectly stated Jug Handle’s degree of difficulty, any attempt by the claimant to familiarize herself therewith would have been futile. Therefore, the court cannot find that claimant violated subdivision (5) of section 18-105 except to the extent that she did not observe the recently installed trail sign and the important information contained thereon which was posted at the entrance to Jug Handle.
Finally, the court finds that claimants’ recovery is not precluded by the affirmative defense of assumption of risk raised in the amended answer. “It is well settled that skiers are deemed to have consented to the inherent risks that are known, apparent or reasonably foreseeable” (Sytner v State of *42 New York, 223 AD2d 140, 144). It is equally well settled, however, “that the duty of a ski operator is to make the ski trails as safe as they appear to be” (Dicruttalo v Blaise Enters., 211 AD2d 858, 859). The “experience and skill of the skier * * * are relevant factors in determining the risks assumed (see, Roberts v Ski Roundtop, 212 AD2d 768)” (Sytner v State of New York, supra at 144). In Ruepp v West Experience (272 AD2d 673, 674), the Appellate Division, Third Department, recently held that:
“An individual who participates in the activity of downhill skiing assumes the inherent risk of personal injury caused by ruts, bumps or variations in the conditions of the skiing terrain (see, General Obligations Law § 18-101; see also, Jordan v Maple Ski Ridge, 229 AD2d 756, 757; Fabris v Town of Thompson, 192 AD2d 1045, 1046). A hazard which has been unreasonably increased or concealed, however, is not within the range of risks that are assumed (see, Benitez v New York City Bd. of Educ., 73 NY2d 650, 658; Rios v Town of Colonie, 256 AD2d 900).”
The instant case involves more than bumps or variations in terrain. The Jug Handle ski jump was intentionally created over several nights and admittedly increased the trail’s level of difficulty. Moreover, the jump located mid-trail following a sharp right-hand curve was a hazard concealed from view of those entering the trail. In the absence of reasonable action by the defendant to warn skiers that the trail had been modified, an act occurring in the midst of the ski season, the jump constituted an unreasonably increased hazard which was not assumed by this claimant, an admitted intermediate skier skiing what was previously designated (and in all but one location continued to be designated) as a blue square (more difficult) trail which was within her level of skiing expertise.
Under such circumstances the defendant did not satisfy its common-law duty to make conditions as safe as they appeared to be for an intermediate skier such as claimant Sheila Sharrow (see Giordano v Shanty Hollow Corp., 209 AD2d 760, lv denied 85 NY2d 802) and, consequently, claimant did not assume the particular risk that she encountered on Jug Handle trail.
Notwithstanding the above, the claimant must be found to have contributed to the happening of the accident in that the proof has established that she failed to observe the sign *43 mounted at the entrance to the Jug Handle trail which indicated both the revised level of difficulty and the presence of the tabletop jump. Although the defendant’s failure to otherwise advise the skiing public of the changes made to the trail during the course of the ski season created a circumstance which reduced the deterrent effect of the trail head sign, the claimant was bound to use reasonable care to observe her surroundings and to see what was there to be seen (Lolik v Big V Supermarkets, 210 AD2d 703, revd on other grounds 86 NY2d 744). Thus, apportionment of liability is appropriate given the claimants’ failure to observe the trail head sign which the court finds was in place and readily observable on February 13, 2000 (see, Walter v State of New York, 185 AD2d 536; Johnston v State of New York, 127 AD2d 980, lv denied 69 NY2d 611).
Accordingly, on the evidence presented at trial the court apportions liability in the proportion of 75% to the state and 25% to the claimant Sheila Sharrow.
All motions not previously decided are deemed denied.

. The claim of Charles Sharrow is derivative only.

. Gore Mountain designates its trails as easier, more difficult and most difficult in compliance with General Obligations Law § 18-103 and 12 NYCRR 54.5 and also uses color coded symbols indicating the varying degrees of dif *22 ficulty on its signs, maps, brochures and advertisements. Easier trails are designated by a green circle, more difficult by a blue square and most difficult by a black diamond. Expert trails are marked with two black diamonds.